STATE OF NEBRASKA, APPELLEE, V.
ROBERT F. MCGINNIS, APPELLANT.

608 N.W.2d 605

Filed February 8, 2000.    No. A-99-419.

Arthur R. Langvardt, of Langvardt & Valle, for appellant.

Don Stenberg, Attorney General, and Marie Colleen Clarke for appellee.

HANNON, SIEVERS, and INBODY, Judges.

INBODY, Judge.

## I. INTRODUCTION

Robert F. McGinnis appeals his convictions for possession of marijuana with the intent to deliver, in violation of Neb. Rev. Stat. § 28-416(1)(a) (Reissue 1995), and possession of marijuana or a controlled substance without the official indicium, in violation of Neb. Rev. Stat. § 77-4309 (Reissue 1996). His sole assigned error on appeal is the district court's overruling of his motion to suppress. For the reasons set forth herein, we reverse, and remand with directions to dismiss.

## II. STATEMENT OF FACTS

On May 30, 1996, an information was filed in Hamilton County District Court charging McGinnis with count I, possession of marijuana with the intent to deliver, and count II, possession of marijuana or a controlled substance without the official indicium. On June 3, McGinnis filed a motion to suppress all evidence obtained from McGinnis or his vehicle for the reason that said evidence was obtained in violation of his constitutional rights. A hearing on McGinnis' motion to suppress was held on April 24, 1997. The following facts were adduced by the State: At about 11:25 a.m. on April 12, 1996, Nebraska State Patrol Trooper Andy Allen was eastbound on Interstate 80 in Hamilton County, Nebraska, when he observed a small white vehicle ahead traveling at a speed slightly above the speed limit, catching up with a "pack" of other eastbound traffic. Trooper Allen observed that the white car "would get right up real close to the bumper of the vehicles ahead of him following way too close — well, less than the two-second rule . . . . and went on around [the pack]." Trooper Allen stopped the vehicle to issue a warning ticket for following too closely to the driver and sole occupant of the vehicle, McGinnis.

Upon making contact with McGinnis, Trooper Allen advised McGinnis why he had been stopped and noted that McGinnis' hands were shaking and that he appeared to be more nervous than most persons under the same circumstances. While receiving McGinnis' Washington State driver's license, rental papers from San Francisco on the vehicle, and flight tickets from Seattle to San Francisco, Trooper Allen conversed with McGinnis about his destination and the purpose of his trip. McGinnis indicated to Trooper Allen that he was on his way to Buffalo, New York, to pick up his brother and then visit his grandfather who was also in New York, but "in the hospital, failing ill." Trooper Allen also learned that McGinnis had flown from Seattle to San Francisco, rented the car at the San Francisco airport, and left from that location. When Trooper Allen asked why McGinnis did not fly to New York, McGinnis stated that he had never driven across the country before and that he wanted to try it one time.

Trooper Allen returned to his patrol vehicle to check on McGinnis' license and the car rental documents, and to write a warning ticket for following too closely. He returned to McGinnis' vehicle, handed McGinnis back his paperwork and the warning ticket, and then asked McGinnis if he was carrying any firearms or drugs. According to Trooper Allen, McGinnis asserted that he was not carrying any weapons or drugs in the vehicle, but would not look directly at Trooper Allen; instead, McGinnis looked down and straight ahead.

Trooper Allen then asked McGinnis if he would have any problem with having the vehicle searched, to which McGinnis inquired whether he had to grant permission. Trooper Allen explained to McGinnis that while he did not have to consent to a search of the interior of the vehicle, a drug detection dog could sniff the exterior air surrounding the vehicle. McGinnis then stated that he would like to "just go on my way if I could." At that point, Trooper Allen told McGinnis that he was going to summon a drug detection dog to perform a sniff of the exterior of McGinnis' vehicle.

Trooper Allen then contacted Nebraska State Patrol Trooper Gerald Schenck to bring his drug detection dog, Nero, to the scene. Trooper Schenck arrived on the scene in less than 10 min-

utes, and a canine sniff around McGinnis' vehicle was conducted. When Nero reached the "right rear quarter panel" of the vehicle, Nero "indicated" by barking and scratching at that area. Thereafter, stating concern over the possibility that someone who had previously used the rental car had left contraband in it, McGinnis consented to allow the interior of his vehicle to be searched. However, McGinnis specifically declined to consent to a search of the vehicle's trunk, stating that he was transporting adult magazines to New York for his brother. The subsequent search of the interior also resulted in Nero indicating to the trunk area through the backseat cushion. Trooper Schenck informed McGinnis that " 'I'm opening it up,' " and he retrieved the keys from the ignition and opened the trunk of the vehicle.

The troopers then conducted a search of the trunk of the vehicle where they located 11 large packages, which contained 28½ pounds of marijuana, wrapped in dryer sheets and plastic. There were no official stamp labels or other indicia on or near the packages of marijuana.

On June 25, 1997, the district court overruled McGinnis' motion to suppress, finding that the stop of McGinnis' vehicle was proper and that Trooper Allen's detention of McGinnis following the issuing of the warning ticket was supported by a "particularized and objective basis for suspecting the defendant of criminal activity."

A stipulated trial was held on October 31, 1997. McGinnis renewed the issues raised in his motion to suppress. The court found McGinnis guilty of the charged offenses, and on April 16, 1999, McGinnis was sentenced to 20 months' to 3 years' imprisonment on count I, possession of marijuana with the intent to deliver. On count II, possession of marijuana or a controlled substance without the official indicium, McGinnis was sentenced to imprisonment of 1 year with credit for 27 days served. The sentences were ordered to be served concurrently. McGinnis has timely appealed to this court.

### III. ASSIGNMENT OF ERROR

McGinnis' sole assigned error on appeal is that the district court erred in overruling his motion to suppress.

## IV. STANDARD OF REVIEW

A trial court's ruling on a motion to suppress evidence, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Ortiz*, 257 Neb. 784, 600 N.W.2d 805 (1999); *State v. Johnson*, 256 Neb. 133, 589 N.W.2d 108 (1999). To the extent questions of law are involved, an appellate court is obligated to reach conclusions independent of the decisions reached by the courts below. *Ortiz, supra*; *Johnson, supra*.

In reviewing a district court's ruling on a motion to suppress evidence obtained through a warrantless search or seizure, an appellate court conducts a de novo review of reasonable suspicion and probable cause determinations, and reviews factual findings for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *State v. Bartholomew*, 258 Neb. 174, 602 N.W.2d 510 (1999). See *State v. Soukharith*, 253 Neb. 310, 570 N.W.2d 344 (1997).

## V. DISCUSSION

### 1. INITIAL STOP

First, we address whether the initial stop of McGinnis was proper. Trooper Allen testified that he observed McGinnis getting "right up real close to the bumper of the vehicles ahead of him following way too close — well, less than the two-second rule . . . . and went on around [the pack]" and that he stopped McGinnis to give him a warning ticket for following too closely.

When a police officer observes a traffic offense, no matter how minor, the officer has probable cause to stop the driver of the vehicle. *Bartholomew, supra*; *State v. Chronister*, 3 Neb. App. 281, 526 N.W.2d 98 (1995). If an officer has probable cause to stop a violator, the stop is objectively reasonable, and any ulterior motivation on the officer's part is irrelevant. *Bartholomew, supra*.

Following too closely is a violation of Neb. Rev. Stat. § 60-6,140(1) (Reissue 1998), which provides: "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, and such driver shall have due regard for the speed of such vehicles and the traffic upon and the condition of the roadway." The standard by which traffic stops are judged is an objective one, and thus if an objectively lawful reason exists for the stop, the fact that the officer hopes to secure consent to search does not make a traffic stop illegal or pretextual. See *U.S. v. Pereira-Munoz*, 59 F.3d 788 (8th Cir. 1995) (applying standard of objective reasonableness and holding that officer's actual state of mind is irrelevant for purposes of determining lawfulness of stop).

Trooper Allen observed McGinnis committing a traffic offense and consequently had probable cause to conduct the stop. Therefore, the initial stop of McGinnis' vehicle was proper.

## 2. DETENTION

We proceed to address the continued detention of McGinnis after the purpose of the traffic stop had been completed. Once the warning ticket had been issued, McGinnis had the right to proceed, unless during the period of lawful detention, Trooper Allen developed other information reasonably justifying a continued investigative detention, which is commonly referred to as a *"Terry* stop." See *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

The test to determine if an investigative stop was justified is whether the police officer had a reasonable suspicion, based on articulable facts, which indicated that a crime had occurred, was occurring, or was about to occur and that the suspect might be involved. *State v. Hiemstra*, 6 Neb. App. 940, 579 N.W.2d 550 (1998). See, also, *State v. Bowers*, 250 Neb. 151, 548 N.W.2d 725 (1996); *State v. Smith*, 4 Neb. App. 219, 540 N.W.2d 374 (1995). Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause. *Soukharith, supra; State v. Tierney*, 7 Neb. App. 469, 584

N.W.2d 461 (1998). It is the totality of the circumstances which determines whether reasonable suspicion to conduct an investigatory stop exists, and acts, even if innocent when viewed separately, may warrant further investigation when viewed together. *Chronister, supra.* See *United States v. Sokolow*, 490 U.S. 1, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989). Where the police have reasonable suspicion, they may pursue their investigation either to confirm their suspicion or to dispel the suspicion that crime is afoot. *Terry, supra*; *State v. Ortiz*, 257 Neb. 784, 600 N.W.2d 805 (1999).

Clearly, McGinnis' constitutionally protected refusal to consent to search is not considered in determining whether Trooper Allen had reasonable suspicion, because exercising one's right to decline permission to search cannot be used to support reasonable suspicion or probable cause. See, *Sokolow, supra*; *State v. Chronister*, 3 Neb. App. 281, 526 N.W.2d 98 (1995). Thus, the facts relied upon by the State in its argument that Trooper Allen had a reasonable suspicion that criminal activity was afoot was (1) McGinnis' nervousness and unwillingness to make eye contact with Trooper Allen and (2) McGinnis' unusual travel arrangements, i.e., flying from Washington State to San Francisco and renting a car at the San Francisco airport to drive cross-country to New York State. The issue before this court is whether these facts, taken together, gave Trooper Allen a reasonable, articulable suspicion that justified his continued detention of McGinnis.

### (a) Nervousness

First, we consider whether McGinnis' nervousness supported a reasonable suspicion that criminal activity was afoot to justify Trooper Allen's continued detention of McGinnis.

This court has previously held that "nervousness alone is not sufficient to justify further detention; only in combination with other suspicious circumstances may it contribute to a finding of reasonable, articulable suspicion." *Tierney*, 7 Neb. App. at 479, 584 N.W.2d at 468. See *State v. Anderson*, 258 Neb. 627, 605 N.W.2d 124 (2000) (trembling hands, pulsing carotid artery, difficulty locating vehicle registration among documents in glove box, and hesitancy to make eye contact are signs of ner-

vousness which may be displayed by innocent travelers and, standing alone, do not provide reasonable suspicion of criminal activity). This view is echoed by other courts.

In *U.S. v. McRae*, 81 F.3d 1528, 1534 n.4 (10th Cir. 1996), the court stated, "We have held that nervousness alone is not sufficient to justify further detention; however, in combination with other suspicious circumstances, it might contribute to a finding of articulable suspicion." Earlier, in *U.S. v. Fernandez*, 18 F.3d 874 (10th Cir. 1994), the court concluded that the nervousness of the driver and his passenger was insufficient to establish reasonable suspicion justifying continued detention after the issuance of a warning citation for excessively tinted windows and improper lane travel. The court elaborated:

> We have repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on the nervousness of either the driver or passenger as a basis for reasonable suspicion "in all cases of this kind must be treated with caution. It is common knowledge that most citizens, and especially aliens, whether innocent or guilty, when confronted by a law enforcement officer who asks them potentially incriminating questions are likely to exhibit some signs of nervousness."

*Id.* at 879, quoting *U.S. v. Millan-Diaz*, 975 F.2d 720 (10th Cir. 1992). See, also, *U.S. v. Beck*, 140 F.3d 1129, 1139 (8th Cir. 1998) ("[i]t certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer"); *U.S. v. Hall*, 978 F.2d 616, 621 n.4 (10th Cir. 1992) (" '[i]t is common knowledge that most citizens . . . whether innocent or guilty, when confronted by a law enforcement officer who asks them potentially incriminating questions are likely to exhibit some signs of nervousness' "); *U.S. v. Walker*, 933 F.2d 812 (10th Cir. 1991) (defendant's nervousness and trembling hands did not give rise to objective reasonable suspicion to justify continued detention after stop for speeding), *cert. denied* 502 U.S. 1093, 112 S. Ct. 1168, 117 L. Ed. 2d 414 (1992); *U.S. v. White*, 890 F.2d 1413, 1418 (8th Cir. 1989) (noting that "becoming nervous when one is confronted by officers of the law is not an uncommon reaction"); *Ferris v. State*, 355

Md. 356, 388, 735 A.2d 491, 508 (1999) ("[t]he innocent and the guilty may both frequently react with analogous trepidation when approached by a uniformed police officer"); *State v. Washington*, 623 So. 2d 392 (Ala. Crim. App. 1993) (listing cases in support of proposition that unless coupled with additional and objectively suspicious factors, nervousness in presence of police officer and/or failure to make eye contact do not establish reasonable suspicion to believe that person is engaged in criminal activity). Thus, McGinnis' nervousness weighs little, if at all, in support of a finding of reasonable suspicion.

### (b) Unusual Travel Arrangements

Next, we consider whether McGinnis' unusual travel arrangements, i.e., flying from Washington State to San Francisco and renting a car at the San Francisco airport to drive cross-country to New York State, supported a reasonable suspicion that criminal activity was afoot to justify Trooper Allen's continued detention of McGinnis. Although unusual or suspicious travel plans may give rise to reasonable suspicion, *U.S. v. Wood*, 106 F.3d 942 (10th Cir. 1997), such a determination is fact based, and where a reasonable explanation for the travel exists, courts have not relied upon this factor as support for reasonable suspicion. Thus, we believe that an overview of the factor present in some other cases considering this issue is in order.

### *(i)* U.S. v. Salzano

In *U.S. v. Salzano*, 158 F.3d 1107 (10th Cir. 1998), a Kansas highway patrol trooper stopped Robert Salzano, who was driving a motor home, for straying onto the shoulder. During the stop, the trooper discovered that the motor home was rented and noticed that Salzano seemed " 'a little nervous' " and that his hands were shaking. *Id.* at 1110. The trooper also noticed the smell of evergreen, which he attributed to the presence of a natural evergreen wreath hanging in the vehicle. Salzano indicated to the trooper that he was on vacation and was driving from San Diego, California, to Springfield, Massachusetts, to visit his father. In response to the trooper's questions about the relative expense of renting a motor home to drive across the country, compared to flying or renting a smaller vehicle, Salzano replied

that he planned to drive his father back to California and that they might visit some friends in South Dakota. The trooper noted that the rental papers on the motor home indicated that a party of three would be traveling in the motor home, but that Salzano was traveling alone. When asked why he was traveling without his wife, Salzano replied that she could not get time off from work. The trooper called for a drug detection dog team, which alerted, and drugs were found in the motor home.

At the suppression hearing, the government relied upon the following factors as support for the reasonableness of the trooper's suspicion that criminal activity was afoot: (1) Salzano's uneconomical decision to travel across the country in a motor home, (2) the discrepancy between the number of persons stated on the rental agreement and the fact that Salzano was traveling alone, (3) the size of the motor home and the knowledge that such motor homes are often used to haul large quantities of drugs, (4) Salzano's visible nervousness, (5) the smell of evergreen in the vehicle, and (6) Salzano's statement that he had come from California. The 10th Circuit Court of Appeals held that reasonable suspicion did not exist and discredited each of the factors relied upon by the prosecution.

The court held that there is nothing criminal about driving across the country instead of flying and that just because the method of travel chosen by the individual may not be economical, that does not mean it is criminal. Further, there were many innocent explanations which could explain the discrepancy between the number of persons stated on the rental agreement and the number in the vehicle, and the fact that a person is driving a rental motor home is not indicative of criminal activity. Salzano's nervousness was also discounted, as his exhibited signs of nervousness were not beyond those normally anticipated during a citizen-police encounter. Additionally, the fact that Salzano's trip started in California was not a reasonable basis to suspect that he was carrying drugs or contraband. Finally, although strong odors may sometimes be used to mask drugs, the smell of evergreen was not out of proportion to the large fresh-cut natural evergreen wreath in the motor home, and the wreath was not unusual, considering the stop occurred only

5 days before Christmas. Thus, the court held that the evidence obtained had to be suppressed.

### *(ii)* U.S. v. Beck

In *U.S. v. Beck*, 140 F.3d 1129 (8th Cir. 1998), an Arkansas police officer stopped a vehicle driven by Kenneth Beck for following too closely. During the stop, the officer observed factors which he claimed gave him reasonable suspicion to detain Beck and have a canine sniff of the vehicle performed. A canine sniff was performed, the dog indicated, and drugs were found. The State argued that the following factors provided reasonable suspicion to detain Beck: (1) Beck was driving a rental car which had been rented by an absent third party, (2) the rental vehicle was licensed in California, (3) there was fast-food trash on the passenger-side floorboard, (4) there was no visible luggage in the passenger compartment of the automobile, (5) Beck was nervous, (6) Beck's trip was from a drug-source state to a drug-demand state, and (7) Beck gave an unusual explanation for the trip, i.e., he was going to North Carolina for a job. The Eighth Circuit Court of Appeals held that reasonable suspicion did not exist in this case.

### *(iii)* U.S. v. Wood

In *U.S. v. Wood*, 106 F.3d 942 (10th Cir. 1997), an officer stopped Terry Wood for speeding. During the traffic stop, Wood initially said that he rented the car in San Francisco, but when corrected by the officer, Wood confirmed that he rented the car in Sacramento. Wood told the officer that he was an unemployed painter and that he expected to return to work in about 6 weeks. He stated that he had flown with his sister to Sacramento on a vacation and that she had returned by plane to Topeka, Kansas, while he chose to drive to enjoy the scenery. The officer noticed the rental car was due back the next day in Sacramento, to which Wood replied that the rental company was aware of his plans to leave the car at his destination.

The officer made several observations that raised his suspicion: (1) Wood's unusual travel plans, (2) Wood's error in identifying the city where he rented the car, (3) fast-food wrappers and open maps in the passenger compartment of the vehicle, (4)

Wood's extreme nervousness, and (5) Wood's prior narcotics conviction discovered during the computer search. The officer detained Wood, a canine sniff was performed, and a resulting search revealed illegal drugs in the trunk.

Wood filed a motion to suppress, which was denied by the district court. On appeal, the 10th Circuit Court of Appeals reversed, finding that all the factors relied upon by the officer were innocent and that even the combination of the factors did not rise to the level of reasonable suspicion necessary for an investigatory stop and detention. First, the court disagreed with the district court that Wood's travel plans were unusual. Wood was on vacation, his work schedule permitted the drive across the country, and he had a valid driver's license and a vehicle properly rented in his name. The court stated it was not criminal to want to see the countryside. Furthermore, the court pointed out that although Wood was unemployed, he could have saved money for the California vacation, gotten the money from a wealthy relative, won the lottery, or put the trip on his credit card.

Second, the court held that Wood's error in misidentifying the city in which he rented the car was not the sort of inconsistency that warranted reasonable suspicion. Third, the court rejected the officer's reliance on the food wrappers and open maps in the passenger compartment, because this is consistent with modern interstate travel. Fourth, the court discounted Wood's nervousness, since many citizens, innocent or guilty, exhibit signs of nervousness when confronted by law enforcement officers. Finally, the court stated that Wood's prior narcotics conviction did not give rise to reasonable suspicion, as Wood truthfully admitted that he had a felony drug history. Thus, the court found that reasonable suspicion did not exist.

### (iv) U.S. v. Tapia

In *U.S. v. Tapia*, 912 F.2d 1367 (11th Cir. 1990), the court held that there were no facts which justified the further investigatory detention of two brothers after a citation for speeding. The court specifically found that the following factors, taken together, did not provide the officer with a minimal, particularized basis for a conclusion of reasonable suspicion of any crim-

inal activity other than speeding on the highway: being Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, and traveling in Alabama with Texas license plates. In so finding, the court stated that "neither police officers nor courts should sanction as 'reasonably suspicious' a combination of factors that could plausibly describe the behavior of a large portion of the motorists engaged in travel upon our interstate highways." *Id.* at 1371. The court thus concluded that the brothers' motion to suppress evidence acquired as a result of a subsequent search should have been sustained.

### *(v)* U.S. v. Ramos

Moreover, in *U.S. v. Ramos*, 20 F.3d 348 (8th Cir. 1994), the court concluded that a pickup truck with foreign plates on an interstate highway and the defendants' uncertainty about their destination did not provide an officer with a reasonable, articulable suspicion to justify the detention of the defendants after the issuance of a ticket for a seatbelt violation. However, upon rehearing, *U.S. v. Ramos*, 42 F.3d 1160 (8th Cir. 1994), *cert. denied* 514 U.S. 1134, 115 S. Ct. 2015, 131 L. Ed. 2d 1013 (1995), the court concluded that although a Fourth Amendment violation had occurred, the consent given coupled with the advisement that consent could be refused was a waiver of the Fourth Amendment violation sufficient to uphold the search.

### *(vi)* State v. DeMarco

In *State v. DeMarco*, 263 Kan. 727, 952 P.2d 1276 (1998), a trooper stopped a vehicle driven by Joseph DeMarco for making a lane change without signaling. During the course of the stop, the trooper identified the following indicators or factors which he claimed caused him to be suspicious that the driver or passenger may have been concealing drugs: (1) The driver was nervous when first approached and was overly talkative and fidgety, his hands were shaking when he handed over the car rental documentation, and this nervousness escalated; (2) the driver told the officer that they were coming from Los Angeles, which is a major source city for narcotics; (3) their route to get from California to Florida was out of the way; (4) they were traveling

in a rental car, and drug traffickers frequently use rental vehicles to haul large quantities of drugs; (5) their route was a major drug courier route; (6) the rental contract showed that the car was to be returned in 3 days; (7) the driver and passenger had inconsistent stories about how the driver had traveled to Los Angeles from Florida; and (8) the trooper learned from the dispatcher that the computer was printing out a criminal record of some type on one or both of the car's occupants. A canine sniff on the vehicle was performed, the dog indicated, and upon a search of the vehicle, a large quantity of drugs was found. The district court granted DeMarco's motion to suppress, and upon appeal by the State, the Kansas Supreme Court affirmed the suppression of the evidence despite finding that the case was "close." *Id.* at 741, 952 P.2d at 1286.

*(vii) Other Cases Where No Reasonable Suspicion Found*

Some other cases in which no reasonable suspicion was found are as follows: *U.S. v. Brugal*, 185 F.3d 205 (4th Cir. 1999) (no reasonable suspicion); *U.S. v. Fernandez*, 18 F.3d 874 (10th Cir. 1994) (nervousness of driver and passenger insufficient to establish reasonable suspicion); *U.S. v. Guzman*, 864 F.2d 1512 (10th Cir. 1988) (officer's observation that passenger looked sick, seemed apprehensive, was sweating considerably, and did not look him in eye, along with officer's belief that laborer and wife could not have saved $5,000 for vacation, was not sufficient to justify *Terry*-type detention), *overruled on other grounds, U.S. v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995), *cert. denied* 518 U.S. 1007, 116 S. Ct. 2529, 135 L. Ed. 2d 1052 (1996); *U.S. v. Kirkpatrick*, 5 F. Supp. 2d 1045 (D. Neb. 1998) (no reasonable suspicion where defendant coming from Southwest driving to Minneapolis and driving rental car, and reason and duration of trip not suspicious); *Ferris v. State*, 355 Md. 356, 735 A.2d 491 (1999) (no reasonable suspicion where driver's eyes were extremely bloodshot, officer smelled no alcohol emanating from driver or vehicle, driver was nervous, and driver and passenger were moving around and looking frequently toward police vehicle); *State v. Chapman*, 23 Kan. App. 2d 999, 939 P.2d 950 (1997) (no reasonable suspicion where heavy breathing, avoidance of eye contact, trembling voice and hands, clean car, fact

that defendant was coming from Phoenix, lack of personal items and luggage in passenger compartment, hotel business card on floorboard with handwritten telephone number on it, and fact that defendant allegedly did not know name of his uncle, person who supposedly owned car); *State v. Washington*, 623 So. 2d 392 (Ala. Crim. App. 1993) (no reasonable suspicion where defendant was nervous, defendant had temporary license, and car was rented by third party and had temporary license plate); *Snow v. State*, 84 Md. App. 243, 247, 578 A.2d 816, 818 (1990) (no reasonable suspicion where driver seemed " 'somewhat nervous' " and had three air fresheners hanging from vehicle's rearview mirror).

### *(viii) Cases in Which Reasonable Suspicion Found*

In contrast to the aforementioned cases, the following is a sample of cases in which the court held that the facts justified a continued detention: *U.S. v. Hill*, 195 F.3d 258 (6th Cir. 1999) (reasonable suspicion existed where driver and passenger gave implausible explanation for their cross-country trip, gave inconsistent statements regarding their travel itinerary, and were nervous during stop; U-Haul rental agreement contained notation "CA," which led officer to believe rental paid for in cash; and inordinate number of used tissues littering U-Haul's floorboard led officer to believe that there was possibility that occupants were using cocaine); *U.S. v. Ozbirn*, 189 F.3d 1194 (10th Cir. 1999) (reasonable suspicion where odor of raw marijuana emanating from vehicle and nervous, talkative, and over-friendly behavior and vague description of travel plans); *U.S. v. Pollington*, 98 F.3d 341, 343 (8th Cir. 1996) (smell of laundry detergent, fact that officer did not believe occupants' story that they had borrowed "gas-guzzling" motor home to take weekend trip from Michigan to Las Vegas, and fact that driver was nervous, avoided eye contact, and shifted in seat clearly gave rise to reasonable suspicion to support detention of motor home and occupants after being stopped for driving on shoulder); *U.S. v. Finke*, 85 F.3d 1275 (7th Cir. 1996) (reasonable suspicion existed where driver and passenger were driving rental car from Indiana to California and back in 5 days, driver was extremely nervous, passenger feigned grogginess, passenger compartment

appeared lived in); *U.S. v. McRae*, 81 F.3d 1528 (10th Cir. 1996) (brief detention following stop lawful in light of driver's vague rental car arrangements, intensity with which driver watched officer through mirror, driver's record of drug-trafficking arrests, and untruthful answer to officer's question about criminal record); *U.S. v. Pereira-Munoz*, 59 F.3d 788 (8th Cir. 1995) (reasonable suspicion existed where driver's hands were trembling; he vehemently disagreed with Arkansas trooper that he had been speeding; he claimed that he had been detained in Texas for 2 hours while his vehicle was searched; he produced Texas warning ticket for speeding, which had "searched" handwritten on it; and trooper had seen Texas tickets before, but never marked "searched"); *U.S. v. Johnson*, 58 F.3d 356 (8th Cir. 1995) (reasonable suspicion existed where driver's and passenger's responses concerning their purpose and destination did not match; driver told officer that he and his wife had driven to Las Vegas from Indiana, gambled for day and then returned; wife claimed they were returning from visit to California, then changed her story and said they were returning from Nevada where they had been visiting relatives), *cert. denied* 516 U.S. 936, 116 S. Ct. 348, 133 L. Ed. 2d 245; *U.S. v. Kopp*, 45 F.3d 1450 (10th Cir. 1995) (reasonable suspicion existed where defendant was nervous, claimed he was driving from California to North Carolina to take dilapidated sofa to some friends but was uncertain as to where in North Carolina he was going, and driver and passenger gave inconsistent itineraries and responses); *U.S. v. Bloomfield*, 40 F.3d 910, 912 (8th Cir. 1994) (officer had reasonable, articulable suspicion justifying continued detention where driver was breathing heavily, his hands were shaking, and his eyes were red; officer saw radar detectors on truck's dashboard; driver opened door slightly, "squeezing" himself out of narrow opening; officer noticed smell of deodorizers; driver carried pager; driver's answers to questions were evasive; and driver failed to give employer's name or name of Pennsylvania town he said he was going to visit), *cert. denied* 514 U.S. 1113, 115 S. Ct. 1970, 131 L. Ed. 2d 859 (1995); *U.S. v. Cummins*, 920 F.2d 498 (8th Cir. 1990) (reasonable suspicion existed where driver and passenger appeared very nervous, and driver told officer passenger's name was Tim, but passenger

informed officer his name was Michael Mayfield), *cert. denied* 502 U.S. 962, 112 S. Ct. 428, 116 L. Ed. 2d 448 (1991); *U.S. v. Hardy*, 855 F.2d 753 (11th Cir. 1988) (reasonable suspicion existed where inconsistencies existed in driver's and passengers' stories and parties did not know each other's surnames despite their claim that they had just completed fishing trip together); *U.S. v. Garcia*, 52 F. Supp. 2d 1239 (D. Kan. 1999); *U.S. v. Garrett*, 47 F. Supp. 2d 1257 (D. Kan. 1999); *State v. Thompson*, 543 So. 2d 1077, 1079 (La. App. 1989) (reasonable suspicion existed where driver was " 'extremely' " nervous and trooper noticed several boxes taped shut in cargo bed of truck covered by camper shell and smelled deodorizing agent coming from back of truck).

### *(ix) Application to Instant Case*

In the instant case, McGinnis indicated to Trooper Allen that he was on his way to Buffalo, New York, to pick up his brother and then visit his grandfather who was also in New York, but "in the hospital, failing ill." Trooper Allen also learned that McGinnis had flown from Seattle to San Francisco, rented the car at the San Francisco airport, and left from that location. When Trooper Allen asked why McGinnis did not fly to New York, McGinnis stated that he had never driven across the country before and that he wanted to try it one time.

While McGinnis' travel plans were somewhat unconventional, they are not indicative of criminal activity. While flying from one location then renting a vehicle to drive across the country may be indicative of criminal activity, there are equally innocent explanations of such conduct, i.e., McGinnis was in San Francisco for a business meeting and wanted to leave directly, or by flying to San Francisco, McGinnis could travel eastbound on Interstate 80 to reach New York. Additionally, McGinnis had a valid driver's license and a vehicle properly rented in his name. Furthermore, although rental vehicles are utilized by drug traffickers in order to circumvent the drug forfeiture laws, rental vehicles are also utilized by law-abiding citizens.

Finally, it is not criminal conduct to desire to drive across the United States in order to view the scenery. Just because the offi-

cer might have chosen a different route or particular mode of transportation to travel across the country does not make a different choice indicative of criminal activity. We do not think that even when coupled with McGinnis' nervousness, McGinnis' travel arrangement is enough to invoke reasonable suspicion that McGinnis had committed, was committing, or was about to commit a crime.

In sum, based on the totality of the circumstances, after a de novo review of the undisputed facts, we find that the reasons articulated by Trooper Allen, i.e., unusual travel arrangements and nervousness, even when considered together, did not amount to reasonable suspicion for the continued detention of McGinnis after the purpose of the traffic stop was completed. For this court to find that reasonable suspicion existed in this case based upon such a weak foundation "would be tantamount to subjecting the traveling public to virtually random seizures, inquisitions to obtain information which could then be used to suggest reasonable suspicion, and arbitrary exercises of police power." See *State v. Chapman*, 23 Kan. App. 2d 999, 1011, 939 P.2d 950, 958 (1997). Accord *U.S. v. Wood*, 106 F.3d 942 (10th Cir. 1997). The trial court erred in denying McGinnis' motion to suppress.

## VI. CONCLUSION

We conclude that while the initial stop of McGinnis was legal, Trooper Allen did not possess reasonable suspicion, supported by specific and articulable facts, that McGinnis had engaged in, was engaged in, or was about to be engaged in criminal activity. Thus, the district court erred in overruling McGinnis' motion to suppress. Consequently, the decision of the district court is reversed, and the cause is remanded with directions to dismiss.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.