IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. TINLIN


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

DOUGLAS A. TINLIN, APPELLANT.


Filed January 7, 2020.    No. A-19-402.


Appeal from the District Court for Sarpy County: GEORGE A. THOMPSON, Judge. Affirmed.

Stuart J. Dornan, of Dornan, Troia, Howard, Breitkreutz & Conway, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.


PIRTLE, RIEDMANN, and BISHOP, Judges.

RIEDMANN, Judge.

### INTRODUCTION

Douglas A. Tinlin was convicted of attempted possession with intent to deliver methamphetamine, 140 grams or more, following the discovery of 11.8 pounds of methamphetamine in his vehicle during a traffic stop. On appeal, he assigns that the district court erred in denying his motion to suppress because of violations of his rights under the Fourth and Fifth Amendments, and that he received an excessive sentence. We affirm.

### BACKGROUND

On or about August 31, 2017, Omaha police K-9 unit officer Jeffrey Vaughn was part of the Sarpy County Metro Area Interdiction Team. While patrolling Interstate 80 in Sarpy County, Nebraska, he observed a Cadillac with Oregon license plates change lanes, and in doing so, the Cadillac pulled behind another vehicle. The Cadillac appeared to be at an unsafe following

distance, so Vaughn used a stopwatch and calculated that the Cadillac was following at a distance of 0.8 seconds. Vaughn testified that the Nebraska Department of Motor Vehicles recommends that vehicles follow no closer than 3 seconds. Based on the Cadillac's following distance, Vaughn initiated a traffic stop.

The driver of the Cadillac was later identified as Tinlin, and his wife was seated in the passenger seat. They provided their drivers' licenses and the vehicle rental agreement to Vaughn upon request. Vaughn asked Tinlin to accompany him to Vaughn's police cruiser, and Tinlin did so. Tinlin sat in the front passenger seat. He was not in handcuffs and was not under arrest. There, Vaughn ran the vehicle, looked over the documents, and engaged Tinlin in conversation, asking him questions such as the reason for his travel and where they were coming from.

Tinlin and his wife live in Des Moines, Iowa, and the vehicle was rented in Las Vegas on August 24, 2017. Tinlin told Vaughn that he and his wife had flown to Las Vegas to visit his uncle who had broken his hip and that they were traveling back to Des Moines by vehicle so they could see the sights in Colorado. There were several factors that arose Vaughn's suspicions that Tinlin and his wife may be involved in criminal activity. When Vaughn initially approached the Cadillac, he observed some blankets on the backseat, an energy drink, and some other snack foods and drinks. Vaughn explained that these items give the appearance of "hard driving," meaning a person is trying to get from one point to another as fast as possible, attempting to avoid hotels, and using the interior of the vehicle as trash. He also observed that Tinlin and his wife had the appearance of methamphetamine users, such as sunken facial features and "pockmarks" on their skin. Additionally, while Tinlin was answering Vaughn's questions, he was evasive, had difficulty remembering and answering questions, was stuttering, and took a while to respond. Vaughn further explained that in his experience, drivers rent higher end vehicles, like Cadillacs, because they believe that law enforcement will not suspect that someone driving such a vehicle is involved in criminal activity like smuggling drugs.

Based on his suspicions of criminal activity, Vaughn requested assistance from other officers. He then contacted dispatch to check the validity of the couples' drivers' licenses and whether they had any outstanding warrants. While he was waiting for a response on the license and warrants check, he returned to the Cadillac and spoke with Tinlin's wife. She said that she and Tinlin had flown to Las Vegas to watch "the fights" and were driving back to see the sights in Colorado. She did not mention Tinlin's uncle as a reason for the visit. The information provided by Tinlin's wife increased Vaughn's suspicions because, based on his training and experience, individuals who are trying to cover up criminal activity will often have a cover story but are not able to provide specific details; therefore, they provide conflicting information.

After speaking with Tinlin's wife, Vaughn returned to his police cruiser and retrieved his canine, Nacho, and walked him up to the Cadillac to deploy him for a drug sniff. At that point, he had not yet received a response on the license and warrants check. Nacho indicated for the presence of narcotics at the trunk of the Cadillac. Vaughn then returned Nacho to the police cruiser and, because he still had not heard back on the data check, called to check the status, which was not yet complete. A couple of minutes later, dispatch contacted Vaughn and informed him that the licenses were both valid and there were no outstanding warrants for either party.

At that point, Vaughn began to write out a warning ticket for Tinlin. He then informed Tinlin that Nacho indicated the odor of drugs coming from the Cadillac and asked whether there were any drugs in the vehicle. Tinlin denied having any drugs in the Cadillac. Vaughn and two additional officers who had arrived at the scene then searched the Cadillac. They found a glass pipe and what appeared to be methamphetamine in the center console and found 11.8 pounds of methamphetamine in the trunk. Tinlin and his wife were then arrested.

Tinlin was charged with possession of methamphetamine with intent to deliver, 140 grams or more, and failure to affix a drug tax stamp. Prior to trial, he filed a motion to suppress the results of the search of the Cadillac and statements he made to Vaughn. A suppression hearing was held, and Vaughn offered the testimony detailed above. A video from Vaughn's police cruiser dash camera was received into evidence. The court also received into evidence Nacho's training records from August 2016 through August 2017 and deployment forms from September 2016 through August 2017.

Tinlin called an expert witness, Andre Falco Jimenez, to testify on his behalf. Jimenez is a retired police officer and K-9 instructor from California who now owns a business training police dogs for patrol and detection of narcotics and explosives. He watched the video of the incident and described several problems he observed with the dog sniff, opining that Nacho's indication of drugs in this case was not reliable. Jimenez explained that the fact that Nacho went to the opposite side of the police cruiser when Vaughn opened the door and Vaughn had to whistle to get Nacho to exit the cruiser is the first sign that there is something broken in their relationship or that Nacho was not selected properly. He also observed that as Nacho started to sniff at the rear of the Cadillac, Vaughn abruptly stopped walking and raised his right hand in the air, which is an indication to Nacho that something needs to happen at that spot, telling Nacho that he needs to sit.

Jimenez additionally explained that the industry standard would be to start a drug dog in a place where the odor, if there was any, would be coming toward the dog, which would generally be toward the front right quarter panel of the vehicle or mostly on the passenger side because the traffic flowing on the driver's side would be pushing all the air across the vehicle to the passenger side. Because of the direction of air flow, according to Jimenez, there would be no odor on the driver's side of the vehicle for Nacho to find in this case. In addition, Jimenez opined that because there was no seam for the trunk on the side of the vehicle where Nacho was sniffing, it was not possible for Nacho to have picked up an odor from that side. On cross-examination, however, Jimenez acknowledged that there could be holes in that side of the vehicle, allowing odor to escape. Finally, Jimenez testified that the sniff and indication were not reliable because Vaughn walked Nacho up to the Cadillac, Nacho sat, and then Vaughn returned Nacho to the cruiser without walking him around the vehicle again.

In response to Jimenez' testimony, the State called Steven Worley, the K-9 supervisor for the Omaha police department and officer who oversees and trains Vaughn and Nacho. Worley explained the examination and certification process, whereby police dogs and their handlers are graded annually and are required to pass a certification test. The certification process entails hiding drugs in different locations and environments to see how the dog responds. There are usually 14 finds set up for the dog with varying levels of difficulty and drug amounts and types, including cocaine, methamphetamine, marijuana, and heroin.

Worley worked with Nacho and his previous handler and then worked with Vaughn and Nacho. He certified them and has watched them train at least monthly, if not weekly, for a number of years. Vaughn and Nacho passed the evaluations, and Nacho was trained and certified to detect drugs at the time of this stop. Worley reviewed the video in this case and did not see any issues with the stop and sniff that occurred.

The district court subsequently filed a written order denying the motion to suppress. The court determined that the traffic stop was valid based on Vaughn's calculation of Tinlin's following distance. In addition, the court found that the search and seizure was valid because Vaughn had not extended the time to conduct the stop or its mission, and the dog sniff was performed while Tinlin was lawfully seized for the traffic violation. The district court concluded that the testimonies of Vaughn and Worley were more credible than that of Jimenez, and thus, the dog sniff was reliable. Finally, the court held that Vaughn's questioning of Tinlin was permissible.

Thereafter, the State was granted leave to file an amended information charging Tinlin with attempted possession of methamphetamine with intent to deliver, 140 grams or more. A stipulated bench trial was held. The video from Vaughn's cruiser was received into evidence as well as stipulated facts. The court found Tinlin guilty and sentenced him to 20 to 25 years' imprisonment. He appeals.

## ASSIGNMENTS OF ERROR

Tinlin assigns that the district court erred in denying his motion to suppress and in imposing an excessive sentence.

## STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Nunez*, 299 Neb. 340, 907 N.W.2d 913 (2018). Regarding historical facts, an appellate court reviews the trial court's findings for clear error. *Id*. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *State v. Nunez, supra*.

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Manjikian*, 303 Neb. 100, 927 N.W.2d 48 (2019). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

## ANALYSIS

Tinlin asserts that the district court erred in denying his motion to suppress because of several violations of his rights under the Fourth and Fifth Amendments. We address each argument individually.

*Traffic Stop.*

Tinlin first argues that the district court should have granted his motion to suppress because Vaughn lacked probable cause to stop his vehicle. We disagree.

A stop of a vehicle is objectively reasonable when the officer has probable cause to believe that a traffic violation has occurred. *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008). Traffic violations, no matter how minor, create probable cause to stop the driver of a vehicle. *Id*. Nebraska law provides that a driver shall not follow another vehicle more closely than is reasonable and prudent, and the driver shall have due regard for the speed of such vehicles and the traffic upon and the condition of the roadway. Neb. Rev. Stat. § 60-6,140(1) (Reissue 2010).

In *State v. Draganescu, supra*, the Nebraska Supreme Court upheld a traffic stop where the officer used an objective standard to determine that a vehicle was following another vehicle too closely. There, the officer testified that he counted one car length for every 10 miles per hour of speed and that the defendant's vehicle was following one car length behind a semi-truck while both vehicles were traveling over 70 miles per hour in the rain. The Supreme Court found that this evidence showed that the officer had probable cause to believe that a traffic violation had occurred, and thus, the stop was objectively reasonable.

This court has also upheld the stop of a vehicle for following too closely based on an officer's testimony that the defendant's car got "'right up real close to the bumper of the vehicles ahead of him'" and that the defendant's vehicle was following too close, "'less than the two-second rule.'" *State v. McGinnis*, 8 Neb. App. 1014, 1016, 608 N.W.2d 605, 608 (2000). There, the trial court found that the stop was proper, and on appeal, we affirmed, concluding that the officer's testimony established that he observed the defendant committing a traffic offense, and thus, he had probable cause to conduct the stop.

Similarly, in *U.S. v. Lopez*, 564 F.3d 1001, 1002 (8th Cir. 2009), a police officer used a stopwatch to determine that the defendant was following 0.58 seconds behind a truck, and because this distance was "less than the two-second standard," the officer concluded that the defendant was in violation of a traffic law. The district court found that there was probable cause to effectuate the traffic stop. On appeal, the Eighth Circuit agreed, noting that the "two-second rule" utilized by the officer is a "'widely used rule of thumb that accounts for the speed of traffic'" and is an appropriate measurement of whether a trailing car is maintaining a reasonable and prudent distance. *Id*. at 1003.

Likewise, in the present case, Vaughn used a stopwatch to determine that Tinlin was following only 0.8 seconds behind another vehicle, less than the 3-second standard recommended by the Nebraska Department of Motor Vehicles, or even the 2-second standard the federal courts consider to be widely used. His testimony, therefore, establishes that he had probable cause to believe that Tinlin committed a traffic violation.

Tinlin argues that the video from Vaughn's police cruiser contradicts Vaughn's testimony regarding his following distance. The district court observed both Vaughn's testimony and the video and accepted Vaughn's calculation of Tinlin's following distance. We review this factual finding for clear error. See *State v. Nunez*, 299 Neb. 340, 907 N.W.2d 913 (2018).

We agree with Tinlin that the video shows him safely changing lanes, following another vehicle for approximately 20 seconds, and then changing lanes again. In addition, it appears from the video that Tinlin's vehicle is traveling at a reasonable speed, that there is little traffic, and that the weather conditions are good. Although it is difficult to discern from the video the distance between the two vehicles, it appears that Tinlin is traveling at a second or less behind the vehicle

in front of him. Thus, we cannot find that the district court's acceptance of Vaughn's calculation of 0.8 seconds was clear error. As such, the State established that Vaughn had probable cause to believe that a traffic violation occurred, and the stop was therefore objectively reasonable.

*Extension of Traffic Stop.*

Tinlin also claims that Vaughn unreasonably extended the scope of the traffic stop and did so without probable cause. He asserts that Vaughn asked questions unrelated to the reason for the stop which were so extensive that they measurably extended the duration of the stop. He additionally argues that Vaughn lacked reasonable suspicion to continue to detain Tinlin beyond the reasonable boundaries of the traffic stop. We disagree that the stop was prolonged beyond the time reasonably required to complete the mission of the stop.

In *State v. Barbeau*, 301 Neb. 293, 917 N.W.2d 913 (2018), the Nebraska Supreme Court recognized that the U.S. Supreme Court has cautioned that a lawful traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of the stop. See *Rodriguez v. United States*, 575 U.S. 348, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015). When the mission of an investigative stop is addressing a suspected traffic violation, the stop may last no longer than is necessary to effectuate that purpose and authority for the seizure thus ends when tasks tied to the traffic infraction are--or reasonably should have been--completed. *Rodriguez v. United States, supra*; *State v. Barbeau, supra*. However, beyond just determining whether to issue a traffic citation or warning, an officer's mission in a traffic stop includes ordinary inquiries incident to the traffic stop. *Rodriguez v. United States, supra*; *State v. Barbeau, supra*. Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Rodriguez v. United States, supra*; *State v. Barbeau, supra*.

In *State v. Barbeau, supra*, the Supreme Court additionally recognized that it, too, has long held that once a vehicle is lawfully stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop. This investigation may include asking the driver for an operator's license and registration, requesting that the driver sit in the patrol car, and asking the driver about the purpose and destination of his or her travel. *Id*. Also, the officer may run a computer check to determine whether the vehicle involved in the stop has been stolen and whether there are any outstanding warrants for any of its occupants. *Id*.

In the present case, after Vaughn initially approached the Cadillac, he obtained the rental agreement and drivers' licenses from Tinlin and his wife, and Tinlin agreed to accompany Vaughn to the police cruiser. Once back in the cruiser, Vaughn ran the vehicle information and requested that dispatch check the validity of the drivers' licenses and whether there were any outstanding warrants for either Tinlin or his wife. Vaughn also engaged Tinlin in conversation about himself and his travels.

Approximately 8 minutes into the stop, while Vaughn was waiting for a response on the license and warrant checks, he returned to the Cadillac to speak with Tinlin's wife. Some of her answers to Vaughn's questions conflicted with the information Tinlin had provided, which furthered Vaughn's belief that Tinlin and his wife were involved in drug trafficking. Vaughn then

returned to his cruiser and retrieved Nacho to conduct a sniff of the Cadillac. At that point, he had not yet received a response on the license and warrants check. Nacho indicated at the trunk of the Cadillac for the presence of narcotics.

Vaughn then returned Nacho to the cruiser and, because he still had not heard back on the data check, he called to check the status and learned that it was not yet complete. A couple of minutes later, dispatch contacted Vaughn to inform him that the drivers' licenses were valid and there were no outstanding warrants for either Tinlin or his wife. At that point, approximately 14 minutes into the traffic stop, Vaughn began to write out the warning ticket for Tinlin.

The questioning that Tinlin challenges took place during those 14 minutes, all of which occurred prior to the time Vaughn received a response on the license and warrants check. According to both the U.S. Supreme Court and the Nebraska Supreme Court, part of an officer's mission in a traffic stop is to determine whether the driver has a valid license and whether there are any outstanding warrants. See, *Rodriguez v. United States, supra*; *State v. Barbeau, supra*. A traffic stop becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of the stop, which includes conducting an investigation into the driver, and the authority for the seizure ends when tasks tied to the traffic infraction are completed. *Rodriguez v. United States, supra*; *State v. Barbeau, supra*.

Vaughn does not allege that 14 minutes is an unreasonable length of time to complete a traffic stop. Rather, he argues that Vaughn's questions, which he claims were unrelated to the stop and made without reasonable suspicion, unreasonably extended the duration and scope of the traffic stop. However, the questioning concluded before the license and warrants check was complete and Vaughn issued the warning ticket. Thus, the questioning was conducted during the time required to conduct the normal investigative inquiries relating to the stop, which an officer is permitted to do as part of the mission of the stop. Accordingly, Vaughn's questioning did not extend the length of the stop, and thus, the district court did not err in concluding that the stop was not impermissibly extended beyond its reasonable boundaries.

*Probable Cause to Search.*

Tinlin next argues that Vaughn lacked probable cause to search the Cadillac because the dog sniff was unreliable. A district court's finding that a drug detection canine is reliable is a finding of fact that is reviewed for clear error. *State v. Howard*, 282 Neb. 352, 803 N.W.2d 450 (2011). We find no clear error here.

Generally, the factors supporting an officer's reasonable suspicion of illegal drug activity, coupled with a well-trained drug detection dog's positive indication of drugs in a vehicle, give the officer probable cause to search the vehicle. *Id*. In *State v. Howard, supra*, the Supreme Court addressed a challenge to the reliability of a canine sniff and adopted the standard that introduction into evidence of a drug detection dog's search records and consideration of those records is appropriate in assessing the totality of the circumstances when determining whether a canine alert, combined with reasonable suspicion factors, amounts to probable cause to search a vehicle.

Here, the court received into evidence Nacho's training and certification records from August 2016 through August 2017 as well as his deployment records from September 2016 through August 2017. Vaughn testified that at the time of this traffic stop, he had been working

with Nacho for approximately 2 years, and explained that he and Nacho had initially completed a 4-week training process, which he described as an "acclimation period," and that they then went through the certification process after which Nacho was certified through the State of Nebraska. Similarly, Worley explained that he had worked with Nacho and his previous handler and that he subsequently worked with Vaughn and Nacho, assisting in training them through the beginning stages and watching them train regularly for a number of years. Worley evaluated Vaughn and Nacho, and they passed the evaluations. Worley reviewed the video of the traffic stop of Tinlin's vehicle and had no issues with the stop and sniff.

Jimenez offered his testimony and opinion about the validity of Nacho's indication at Tinlin's vehicle, but the district court accepted the testimony of Vaughn and Worley as credible. The court concluded that Jimenez was in a more tenuous position to evaluate Nacho's behavior because he was not present at the traffic stop and found that Vaughn was additionally in a superior position, given his experience interpreting Nacho's behaviors. The court determined that Vaughn's interpretation of Nacho's indication was reliable given the certification that he had achieved and that the certification process utilized with Nacho passed "constitutional muster." Although Tinlin argues that the district court erred in disregarding Jimenez' testimony, we review the court's factual finding for clear error, and given the conflicting testimony and the court's rationale for its decision, we cannot find that the court's acceptance of the testimonies of Vaughn and Worley over Jimenez was clearly erroneous. Therefore, the district court did not err in finding that Nacho's indication was reliable.

*Fifth Amendment.*

Tinlin argues that Vaughn violated his Fifth Amendment rights when he subjected him to a custodial interrogation without advising him of his *Miranda* rights. He claims that he was subjected to a custodial interrogation that exceeded the bounds of the reason for the traffic stop when Vaughn asked him questions unrelated to the traffic violation and which measurably extended the duration of the stop. We disagree.

The safeguards provided by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. *State v. Landis*, 281 Neb. 139, 794 N.W.2d 151 (2011). *Miranda* warnings are required only when there has been such a restriction on one's freedom as to render one in custody. *State v. Landis, supra.* A person is in custody for purposes of *Miranda* when there is a formal arrest or a restraint on his or her freedom of movement to the degree associated with such an arrest. See *State v. Landis, supra*.

Persons temporarily detained pursuant to an investigatory traffic stop are not in custody for purposes of *Miranda*. *State v. Landis, supra*. When a person is detained pursuant to a traffic stop, there must be some further action or treatment by the police to render the driver in custody and entitled to *Miranda* warnings. *Id*. In *Landis*, the Supreme Court observed that the defendant's presence in the trooper's cruiser did not raise the interaction to the extent analogous to an arrest, because there was no indication that the trooper used force or threats to get the defendant to enter the cruiser or to remain there.

Similarly, in the instant case, Tinlin was temporarily detained pursuant to a traffic stop and voluntarily entered Vaughn's police cruiser pursuant to Vaughn's request. Thus, some further action or treatment by Vaughn that would raise Tinlin's detention to an extent analogous to an arrest was required. We determined above that Vaughn's questions occurred during the time required to conduct the normal investigative inquiries relating to the stop and that they therefore did not impermissibly extend the duration of the traffic stop. Because there was no further action or treatment that raised the detention to an extent analogous to an arrest, Tinlin was not "in custody" at the time Vaughn questioned him, and thus, *Miranda* warnings were not required before he could be questioned. Accordingly, any statements he made to Vaughn while seated in the cruiser were not obtained in violation of his Fifth Amendment rights and were admissible. As such, the motion to suppress was properly denied on these grounds.

*Excessive Sentence.*

Tinlin argues that the district court abused its discretion in imposing an excessive sentence. We find no abuse of discretion in the sentence imposed.

Attempted possession of methamphetamine with intent to deliver, 140 grams or more is a Class II felony. Neb. Rev. Stat. §§ 28-201 and 28-416(10)(a) (Cum. Supp. 2018). Class II felonies are punishable by 1 to 50 years' imprisonment. Neb. Rev. Stat. § 28-105 (Cum. Supp. 2018). Therefore, Tinlin's sentence of 20 to 25 years' imprisonment is within the statutory limits and we review it for an abuse of discretion.

When imposing a sentence, the sentencing court is to consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Manjikian*, 303 Neb. 100, 927 N.W.2d 48 (2019). However, the sentencing court is not limited to any mathematically applied set of factors. *Id*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Tinlin argues that the court abused its discretion when it placed undue weight on irrelevant factors, those being the amount of methamphetamine involved and evidence that was not part of the crime of which he was convicted. We disagree that these factors were irrelevant in the determination of an appropriate sentence.

Tinlin claims that the court improperly "emphasized the amount of methamphetamine involved and stated that if Tinlin were being sentenced on a different crime based solely on the weight, he would receive a penalty of 20 years to life." Brief for appellant at 29. Tinlin was originally charged with possession of methamphetamine with intent to deliver, 140 grams or more, which is a Class IB felony, punishable by 20 years' to life imprisonment. See §§ 28-416(10)(a) and 28-105. Thus, the district court's statement was factually accurate. Just prior to trial, the State filed an amended information charging Tinlin with attempted possession with intent to deliver. The law invests a trial judge with a wide discretion as to the sources and types of information used to assist him or her in determining the sentence to be imposed within statutory limits. *State v.*

*Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). A court is permitted to consider the facts underlying dismissed charges. See *id*. As such, the district court's consideration of the facts underlying the original charge and the potential penalty Tinlin originally faced were not irrelevant or inappropriate.

Moreover, Tinlin challenges the court's reference to information in the presentence investigation report regarding a federal investigation. The presentence investigation report indicates that during the traffic stop, Vaughn contacted a law enforcement officer in Des Moines. That officer provided Vaughn information related to Tinlin's involvement in an ongoing federal weapons and drug investigation. Specifically, Tinlin and his residence in Des Moines had been identified by several confidential informants as the source of a shotgun that was recovered during the federal investigation. The Des Moines officer additionally told Vaughn that Tinlin and his residence had further been identified as the location where multi-pound quantities of methamphetamine were being stored, and two confidential informants had stated that Tinlin had a California source of methamphetamine. Based on the discovery of the 11.8 pounds of methamphetamine in the present case, the Des Moines officer obtained a federal search warrant for Tinlin's residence in Des Moines. Two stolen vehicles and three stolen firearms were found on the property. In addition, officers located 17 grams of methamphetamine, $14,000 in cash, and 69 firearms in the residence. A friend of Tinlin's who arrived at the residence during the search admitted that Tinlin and his wife were traveling and supposed to be on their way home with a "whole bunch of dope."

Sentencing courts are required to give due consideration to the information contained in a written presentence investigation report. *State v. Stahl*, 240 Neb. 501, 482 N.W.2d 829 (1992); Neb. Rev. Stat. § 29-2261 (Cum. Supp. 2018). The district court's consideration of this information at sentencing in the instant case was therefore not inappropriate.

Tinlin otherwise argues that the court failed to give due weight to certain mitigating facts such as his age, family support, and aspects of his criminal history. At sentencing, the district court highlighted some of these factors and indicated that it considered all required factors as well as the information contained in the presentence investigation report. There is no indication that the court considered inappropriate factors or otherwise abused its discretion in the sentence imposed. We therefore affirm Tinlin's sentence.

## CONCLUSION

We conclude that the district court did not err in denying Tinlin's motion to suppress based on alleged violations of the Fourth and Fifth Amendments. We further find no abuse of discretion in the sentence imposed. The conviction and sentence are therefore affirmed.

AFFIRMED.