JAMES H. NEWTON II, PERSONAL REPRESENTATIVE OF THE ESTATE OF WESLEY DENTON HEINRICH DUNN, DECEASED, APPELLANT AND CROSS-APPELLEE, V. RAY HUFFMAN AND SCOTTS BLUFF COUNTY SHERIFF'S DEPARTMENT, A DEPARTMENT OF SCOTTS BLUFF COUNTY, NEBRASKA, A POLITICAL SUBDIVISION, APPELLEES AND CROSS-APPELLANTS.

632 N.W.2d 344

Filed July 31, 2001. No. A-00-470.

James L. Zimmerman, of Sorensen, Zimmerman & Mickey, for appellant.

Michael J. Javoronok and Sterling T. Huff, of Michael J. Javoronok Law Firm, for appellee.

Hannon, Inbody and Moore, Judges.

Moore, Judge.

## I. INTRODUCTION

On June 19, 1997, Wesley Denton Heinrich Dunn was shot and subsequently died in Scotts Bluff County, Nebraska. James H. Newton II, as Dunn's personal representative, filed suit against Deputy Sheriff Ray Huffman and his employer, Scotts Bluff County, Nebraska (County) (collectively appellees), in the district court for Scotts Bluff County. Newton sought damages for Dunn's death pursuant to 42 U.S.C. §§ 1983 and 1988 (1994 & Supp. IV 1998). The district court granted appellees' motion for summary judgment, overruled their objections to the admission of certain evidence, and denied Newton's motion for new trial. Newton subsequently appealed to this court, and appellees cross-appealed. For the reasons stated below, we affirm.

## II. BACKGROUND

On the evening of June 19, 1997, Huffman was on duty as a Scotts Bluff County deputy sheriff and was wearing a uniform. The 911 emergency dispatch service (911) received a citizen call at approximately 8:50 p.m., regarding a possible drunk driver described as a white, blond female, driving a silver Firebird, license No. 21-BN63. The vehicle was reported to be westbound on U.S. Highway 26 from Harry's Truck Stop in Minatare, Nebraska. A records check by 911 indicated the vehicle was a silver Pontiac Firebird registered to Cynthia Brown of Gering, Nebraska. At approximately 10:38 p.m., 911 received a second call in reference to this same vehicle. A Violet Stover reported that the vehicle was now parked at trailer No. 9 in Harry's Trailer Court in Minatare, that a " 'Cindy' " had asked to use Stover's telephone to call a cousin for assistance, that Cindy and her boyfriend had had a fight, and that the boyfriend had been drinking. Stover expressed concern that there would be additional trouble, but did not indicate that Cindy had asked her to place a call to 911 or had requested assistance other than wanting to use Stover's telephone. Stover further indicated that Cindy "took off walking down the highway." A Deputy Bob DeLara also spoke with Stover. DeLara advised the dispatcher that he would notify Huffman of the reported possible domestic problem, requiring a check on the welfare of Cindy. Thereafter, 911 received a third call expressing concern that the occupants of trailer No. 9 were on drugs. The caller expressed concern about the occupants' behavior and reported that other residents of the mobile home court were scared.

Huffman was dispatched to Harry's Trailer Court. En route, he spoke with Stover by cellular telephone and learned that the Firebird had recently been driven away by a blond male described as the "boyfriend." Huffman asked the dispatcher for verification that the Firebird was registered to Brown. From a prior incident, Huffman was aware that Brown's boyfriend was Dunn. In approximately April 1997, Huffman and DeLara had investigated another incident involving Dunn and Brown. At that time, Dunn had been arrested for assaulting Brown by knocking out her two front teeth. Dunn had been drunk and had mildly resisted arrest.

During the April 1997 incident, Huffman had learned that Dunn's driver's license was under suspension. From the description given on the evening of June 19, Huffman assumed that the male driver was Dunn and that if the driver was Dunn, he was driving under suspension. Although Huffman believed Dunn was still under suspension on June 19, he did not seek confirmation of this from 911. Huffman intended to stop Dunn to investigate the reported domestic disturbance in Minatare, investigate the welfare of Brown, and verify that Dunn was not driving under suspension.

At approximately 11 p.m., Huffman was driving east on Highway 26 toward Minatare when he passed the Firebird traveling west. Huffman turned his vehicle around and followed the Firebird. After following the Firebird for a distance, Huffman formed the opinion that Dunn was driving. By the time the Firebird turned left on East Overland, Huffman had activated his vehicle's flashing overhead lights. Huffman radioed DeLara that he planned to stop the Firebird near the Western Sugar factory on East Overland and called 911, which confirmed that this was the vehicle that had been involved in the Minatare disturbance. The Firebird did not initially stop for Huffman, but, rather, alternated speeding up and slowing down, eventually turning into the Western Sugar factory parking lot and stopping. The driver then exited the Firebird, at which time Huffman positively recognized him as Dunn.

Huffman testified in his deposition that Dunn did not make any aggressive movements toward Huffman when Dunn exited the Firebird. Nor did Huffman recall Dunn's saying anything to him. Huffman recalled yelling at Dunn to stop because he was under arrest, but did not recall whether he indicated to Dunn why he would be under arrest. Dunn did not stop when Huffman yelled that he was under arrest, but ran from the driver's side of his car into the employee entrance of the factory. Huffman indicated that Dunn looked back as he was pulling open the door, at which point Huffman caught up to him and again told Dunn that he was under arrest. Huffman testified that Dunn threw out his left arm to knock Huffman away from him, contacting either Huffman's arm or the flashlight that Huffman was carrying. When Dunn entered the factory, Huffman knew that DeLara was

reasonably close and responding to his location. Huffman indicated that Dunn proceeded through the door into a hallway, which runs north and south. Huffman returned his flashlight to its holder on his duty belt and went inside after Dunn. Huffman stated that his gun was holstered as he entered the factory and that he chased Dunn through the hallway.

Huffman estimated that Dunn was 10 to 15 feet ahead of him going down the hallway, but stopped when he reached a stairwell on the west side of the hallway, where Huffman again advised Dunn that he was under arrest. Huffman testified that near the stairway, Dunn suddenly turned around and looked toward Huffman. Huffman indicated that he continued to approach Dunn until he was approximately 8 feet from Dunn, at which point Dunn "squared off" with Huffman. Huffman testified that Dunn's face was "full of rage" and that the look in Dunn's eyes "told [Huffman that Dunn] was going to kill [him]." Huffman indicated that Dunn physically attacked him and struck him several times about the head, including one solid blow to the face which dislodged his glasses and rocked him back a step. Medical records admitted into evidence indicate that Huffman incurred a facial cut to his left cheek, requiring 16 stitches. Huffman testified that after this blow from Dunn which rocked Huffman back a step, he came back forward and tried to refocus. Huffman indicated that he then realized Dunn was off to his left and that Dunn's left arm was "blading across [Huffman's] body." Huffman testified that he could feel something tugging at his gun belt and that he reached down with his own right hand to protect his gun. Huffman further testified that his hand was on the grip and that Dunn's hand was on the back part of the gun's slide. Huffman stated that both men had one hand on the gun when it came out of the holster and that as the struggle continued, the gun accidentally discharged, fatally striking Dunn. Huffman did not know whose finger was on the trigger when the gun discharged, and his initial impression was that the bullet went into the wall.

The holster worn by Huffman on the night in question had a "thumb break" composed of two leather pieces or "ears" that went up along both sides of the gun slide up to the rear of the slide. Another piece, the "retention strap," wrapped over the rear or top

of the slide of the gun as it rested in the holster and snapped inside of the top of the "ear" next to Huffman's body. To unsnap the holster and remove the weapon, one only needs to slide the thumb down the inside of the ear next to the body and push the side of the holster out or away from the snap. Huffman testified that the holster was snapped shut when he entered the building and that it would not have been his hand that unsnapped the holster as his hand was on the bottom part of the grip of the weapon.

Huffman testified that as soon as the weapon discharged, Dunn's hand released the gun, at which point, Huffman stated, he immediately reholstered it. Huffman's impression while reholstering his gun was that Dunn spun counterclockwise 360 degrees away from him and began to move north down the hallway toward the door they had originally entered. Huffman testified that he then followed and came up behind Dunn and that Dunn dropped to his knees. Huffman then pushed Dunn to the floor, and Dunn came back up hard against him. Huffman took Dunn back down to the floor, told him to stay down, brought Dunn's right arm perpendicular across Dunn's back, began to call on the radio, and then realized that Dunn was bleeding. Huffman further testified that he was not immediately aware that Dunn had been hit and that he was surprised to find that Dunn was injured. Huffman testified that he recognized, based upon his experience, that the blood was coming from Dunn's lungs. Huffman then realized that Dunn was seriously hurt, radioed for assistance, told an unidentified man in a white hardhat to call an ambulance, and remained on the floor with Dunn until other officers arrived. Huffman testified that by training, he knew that if someone was seriously injured not to roll them over or to do chest compressions with a chest injury.

Deposition and affidavit testimony was presented from Scotts Bluff County Sheriff James L. Moore. Moore testified that although the County had no specific, separate policies regarding "foot pursuit" and the "use of backup," the written policies for the "use of force" and "vehicle pursuit" covered and were applicable to those concepts. Moore further stated that during his tenure as sheriff, no deputies who had not yet received their training and certification from the Nebraska Law Enforcement Training Center were allowed to be on road patrol alone. From

Moore's records, he knew that Huffman was certified and trained by the training center and that Huffman had been trained in the legal requirements for probable cause, the use of force, emergency medical treatment, and cardiopulmonary resuscitation (CPR). Moore indicated that in his 4 years in office, there had been no claims of improper supervision or training that he was aware of, other than the present case, nor was he aware of any pattern of complaints of improper training.

Newton claimed, on Dunn's behalf, both before the district court and on this appeal, that Huffman's gun was already drawn at the time of the physical altercation. Newton presented deposition testimony and affidavits from John Oliver, a private investigator and retired Nebraska State Patrol investigator, who opined via affidavit and deposition that a mark found on Dunn's right inner forearm was caused by the front sight of Huffman's gun when Dunn threw a punch at Huffman and that therefore, the weapon had to have already been drawn and not holstered at the time Dunn threw the punch.

Newton filed an amended petition against appellees on December 23, 1998. Newton apparently initially alleged a tort claim to which a demurrer was sustained and which is not the subject of this appeal. In his amended petition, brought pursuant to §§ 1983 and 1988, Newton alleged violations of article I, §§ 3 and 9, of the Nebraska Constitution and the 8th and 14th Amendments to the U.S. Constitution that Huffman, acting in his official capacity as a deputy sheriff, willfully, knowingly, recklessly, intentionally, and maliciously, under color of state law, deprived Dunn of his constitutionally protected rights in the following respects:

A. In stopping a vehicle without reasonable or probable cause to do so;

B. In attempting to arrest Dunn that evening;

C. By chasing Dunn on foot into a building after Huffman learned Dunn's identity and after Huffman had the vehicle Dunn was driving stopped and blocked so it could not be moved, without waiting for back-up when Huffman knew back-up was on its way and in close proximity;

D. By attempting to arrest Dunn without waiting for back-up when Huffman knew Dunn may attempt to resist

being arrested and returned to the Scotts Bluff County jail where he had been sexually assaulted by inmates while incarcerated therein;

E. In using excessive force while attempting to arrest Dunn who Huffman at that time only believed, but had not verified, that Dunn may have been driving under suspension, and knew Dunn had not been involved in any other criminal activity;

F. By failing to use his baton or mace to subdue Dunn instead of his weapon, before attempting to handcuff Dunn;

G. In pulling his handgun the [sic] its holster and discharging the handgun in the direction of Dunn while attempting to arrest of [sic] Dunn;

H. In failing to provide any emergency medical treatment or CPR to Dunn after shooting Dunn to prevent Dunn from bleeding to death at the scene while waiting for emergency medical personnel to arrive.

Newton also alleged that Dunn's death resulted from the official policies or deliberate indifference of the County, which failed as follows:

A. To properly train Huffman in the necessity of probable cause to stop a vehicle and when to pursue of [sic] person on foot;

B. To properly train Huffman in the use of back-up when attempting to arrest of [sic] an individual who Huffman has identified and is on foot;

C. To properly train Huffman in proper use of force;

D. To properly train Huffman and other deputies in emergency medical treatment/CPR of gunshot victims to prevent them from bleeding to death while waiting for emergency medical personnel to arrive;

E. To properly supervise Huffman.

In their answer filed April 1, 1999, appellees alleged that the claim was based on the performance of discretionary functions; that none of Huffman's acts violated any clearly established statutory or constitutional right; that the claim arose out of acts for which sovereign immunity had not been waived; that Huffman acted in good faith, without malice, and with a reasonable belief as to the validity of his actions; that Huffman's use

of force was justified; that Dunn assumed the risk of the danger confronting him; that Dunn's injuries were caused by Dunn's negligent or intentional acts in attacking and striking Huffman and in trying to obtain Huffman's weapon; and that Dunn was killed in the process of trying to kill Huffman.

In its memorandum order filed March 20, 2000, the district court sustained the motion of appellees for summary judgment and dismissed Newton's amended petition. The court found that taken in the light most favorable to Newton, the record showed that Huffman shot Dunn as Huffman was being physically assaulted by Dunn. The court further found that Huffman had probable cause to arrest Dunn on the evening of June 19, 1997; that based on an objective reasonableness analysis, Huffman used reasonable force to effect the seizure of Dunn and reasonable force to protect himself from serious injury when assaulted by Dunn; that Huffman was entitled to qualified immunity as a reasonable officer in Huffman's position could have believed the use of deadly force was not excessive; that he was justified to believe Dunn posed a threat of serious harm to him; and that the evidence was devoid of any subjective element, or a sufficiently culpable state of mind to preclude summary judgment on an Eighth Amendment basis. Finally, with regard to Newton's "failure to train" claim against the County, the district court found that the County had a " 'use of force' " policy, which included guidelines on the use of deadly force, and that the lack of separate and distinct policies regarding " 'foot pursuit' " and " 'use of backup' " could not be said to be " 'so obvious' " that any failure to separately train on those issues could be properly characterized as a " 'deliberate indifference' " to an arrestee's constitutional rights. The court further found that Newton incorrectly asserted that deadly force was used because Dunn fled and that no material issue of fact existed that deadly force was used because Dunn physically assaulted Huffman. The district court included its legal analysis of each of the above findings, which we will discuss in greater detail in the relevant sections below.

Newton filed a motion for new trial on March 29, 2000, which was overruled by the court in its journal entry dated April 11, 2000. Newton subsequently perfected his appeal to this court.

## III. ASSIGNMENTS OF ERROR

Newton asserts that the district court erred in granting appellees' motion for summary judgment and in dismissing his petition.

On cross-appeal, appellees assert that the district court erred in (1) admitting the testimony of Oliver because he was not an expert and (2) admitting into evidence the affidavits of Oliver.

## IV. STANDARD OF REVIEW

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Baye v. Airlite Plastics Co.*, 260 Neb. 385, 618 N.W.2d 145 (2000). In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Id.*

An appellate court's review of the trial court's admission or exclusion of expert testimony which is otherwise relevant will be for an abuse of discretion. *Snyder v. EMCASCO Ins. Co.*, 259 Neb. 621, 611 N.W.2d 409 (2000). An abuse of discretion occurs when the trial judge's reasons or rulings are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Sharkey v. Board of Regents*, 260 Neb. 166, 615 N.W.2d 889 (2000).

## V. ANALYSIS

### 1. NEWTON'S APPEAL

In his brief on appeal, Newton asserts that the district court erred in granting appellees' motion for summary judgment and in dismissing his petition. In his initial brief on appeal, Newton does not refer to the 19-page memorandum order containing a reasoned analysis from the district court in support of its decision to grant appellees' motion for summary judgment. Instead, Newton relies on the general proposition that where reasonable minds differ as to whether an inference supporting

the ultimate conclusion can be drawn, summary judgment should not be granted. See *Sherrets, Smith v. MJ Optical, Inc.*, 259 Neb. 424, 610 N.W.2d 413 (2000). Newton essentially asserts that Huffman's version of events does not make sense, that none of Huffman's actions on the night in question were reasonable, and that reasonable minds could clearly differ as to whether Dunn was shot in the course of physically assaulting Huffman, as found by the district court, or whether Huffman shot Dunn while Dunn was trying to escape from the hallway.

In its memorandum order, the district court summarized the facts, viewed in the light most favorable to Newton, and found no material issue of fact as to the following:

1. At all pertinent times on June 19, 1997, Huffman was acting in his official capacity as a deputy sheriff. He was wearing a clearly identifiable uniform with badge, and was driving a marked patrol vehicle.

2. Huffman stopped Dunn's vehicle in the Western Sugar employee's parking lot on East Overland, Scottsbluff, NE., using the vehicle's activated overhead lights.

3. Dunn disobeyed Huffman's command to "stop", and ran inside a Western Sugar building. Huffman pursued Dunn on foot.

4. The two men ran down a hallway to a point near a stairwell at which time Dunn suddenly turned, charged, and began physically assaulting Huffman.

5. Dunn struck Huffman in the face at least once with sufficient force to dislodge his eyeglasses, rock him backwards, and require 16 stitches in his face.

6. As Dunn assaulted Huffman with his hands, Dunn suffered a single, fatal gunshot wound fired from Huffman's gun.

The district court concluded that taken in the light most favorable to Newton, Huffman shot Dunn as he was being physically assaulted by Dunn, and at issue, was whether the above facts entitled Huffman to a summary judgment.

Although Newton asks us to speculate, and there is some evidence to suggest, that Huffman's gun was drawn when Dunn threw at least one of the alleged punches, the district court did not make a finding with regard to when Huffman's gun was drawn.

Our review of the court's order leads us to the conclusion that it was unnecessary to determine how or when the gun was drawn as it relates to the reasonableness of Huffman's use of force, which will be discussed in greater detail below. We agree that the evidence, taken in the light most favorable to Newton, shows that Dunn struck Huffman at least once in the face with sufficient force to cause a wound requiring 16 stitches to Huffman's face and that while assaulting Huffman with his hands, Dunn suffered a single, fatal gunshot wound fired from Huffman's gun. Accordingly, we turn our attention to an examination of whether the above facts entitled appellees to a summary judgment.

### (a) § 1983

In his petition, Newton alleged a violation of Dunn's civil rights, specifically that the County failed to establish appropriate procedures and policies. Newton further alleged that Huffman, acting under color of law, used excessive force in attempting to arrest Dunn and failed to provide emergency medical treatment after Dunn was shot. Newton's amended petition stated that his lawsuit was brought pursuant to §§ 1983 and 1988; the 8th and 14th Amendments to the U.S. Constitution; and article I, §§ 3 and 9, of the Nebraska Constitution. Appellees generally denied Newton's allegations and set forth several affirmative defenses in their answer, including the defense of qualified immunity.

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

■ Only two factual allegations are necessary to state a cause of action under § 1983: (1) a defendant's deprivation of a plaintiff's right secured by the Constitution and laws of the United States and (2) the deprivation occurred under color of law. *Mach v. County of Douglas*, 259 Neb. 787, 612 N.W.2d 237 (2000). In his reply brief, Newton concedes that the question at issue is whether Huffman deprived Dunn of some right guaranteed under federal law. As noted previously, Newton alleged a violation of Dunn's rights as guaranteed by the 8th and 14th Amendments.

Although a 14th Amendment claim involves a violation of substantive due process, the U.S. Supreme Court has held:

> [*A*]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

(Emphasis in original.) *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). See *Nelson v. County of Wright*, 162 F.3d 986 (8th Cir. 1998) (excessive force claims arising from arrests are to be analyzed under Fourth Amendment guarantee against unreasonable seizures).

From this, the district court reasoned that the appropriate analysis in the present case depended on whether Dunn had been arrested. The court concluded that if an arrest did not occur on the evening of June 19, 1997, the appropriate analysis of excessive force would fall under the 14th Amendment's substantive due process right; however, if Dunn was "seized," then the appropriate analysis would fall under the 4th Amendment's guarantee from unreasonable seizures.

(b) Validity of Stop and Probable Cause for Arrest

■ In determining whether to apply the 4th or 14th Amendment analysis as mentioned above, the district court first

examined the validity of the stop and concluded that Huffman had probable cause to arrest Dunn on the evening of June 19, 1997. Newton claims that Huffman's stop of Dunn was unlawful and that his unlawful act was the precipitating cause of all subsequent events, including Dunn's death. Police can constitutionally stop and briefly detain a person for investigative purposes if the police have a reasonable suspicion, supported by articulable facts, that criminal activity exists, even if probable cause is lacking under the Fourth Amendment. *State v. Anderson*, 258 Neb. 627, 605 N.W.2d 124 (2000). Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause. *Id.* Whether a police officer has a reasonable suspicion based on sufficient articulable facts requires taking into account the totality of the circumstances. *Id.* Such an assessment includes all of the objective observations and considerations, as well as the suspicion drawn by a trained and experienced police officer by inference and deduction that the individual stopped is or has been or is about to be engaged in criminal behavior. *State v. Smith*, 4 Neb. App. 219, 540 N.W.2d 374 (1995).

An officer is not required to wait until a crime has occurred before making an investigative stop. *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), *cert. denied* 510 U.S. 836, 114 S. Ct. 113, 126 L. Ed. 2d 78. The factual basis for an investigatory stop need not arise from the officer's personal observation, but may be supplied by information acquired from another person. *State v. Ege*, 227 Neb. 824, 420 N.W.2d 305 (1988). When the factual basis is supplied by another, the information must contain sufficient indicia of reliability. *Id.* A reasonably founded suspicion to stop a vehicle cannot be based solely on the receipt by the stopping officer of a radio dispatch to stop the described vehicle without any proof of the factual foundation for the relayed message. *State v. Soukharith*, 253 Neb. 310, 570 N.W.2d 344 (1997). If a radio dispatch has been issued on the basis of articulable facts supporting a reasonable suspicion that a wanted person has committed or is committing an offense, then a police officer may

rely on the dispatch alone to stop the person to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information. *Id.*

In the present case, Huffman was aware that 911 had received several calls regarding a domestic disturbance in Minatare. He had spoken personally with one of the 911 callers, had located a Firebird, and had verified that it was the vehicle reportedly involved in the disturbance. Huffman also learned that the vehicle was registered to Brown. Huffman knew that Dunn had recently been Brown's boyfriend and that Dunn's driver's license had recently been under suspension. Huffman noted that the driver of the vehicle he had located generally fit Dunn's description. Based on these facts, the district court found that Huffman had reasonable suspicion, based on articulable facts and prior knowledge, that Dunn was involved in the disturbance, that Dunn was the driver of the Firebird, and that Dunn's driver's license was under suspension. We agree with the district court that the combination of those articulable facts established a reasonable suspicion for an investigatory stop to make further inquiry.

Newton asserts that Huffman could have and should have verified with 911 that Dunn's license was still under suspension. Newton also relies on the fact that Brown did not request any assistance other than the use of Stover's telephone. It is the totality of the circumstances which determines whether reasonable suspicion to conduct an investigatory stop exists, and acts, even if innocent when viewed separately, may warrant further investigation when viewed together. *State v. McGinnis*, 8 Neb. App. 1014, 608 N.W.2d 605 (2000). Where the police have reasonable suspicion, they may pursue their investigation either to confirm their suspicion or to dispel the suspicion that crime is afoot. *Id.* Finally, Newton asserts that Huffman went looking for Dunn on the evening of June 19, 1997, with every intention of arresting him that evening for something. Newton argues that Huffman took it upon himself to assume that Dunn was the one who had taken Brown's car and that if given an opportunity, Dunn would "get her." However, in *State v. McGinnis, supra*, the court made it clear that if an officer has probable cause to stop a violator, the stop is objectively reasonable, and any ulterior motivation on the officer's part is irrelevant. Based on the totality of

the circumstances on the evening of June 19, Huffman had objective manifestations for an investigative stop of the Firebird.

The district court in this case further concluded that Huffman had probable cause to arrest Dunn on that evening, noting that a law enforcement officer may make a lawful arrest without a warrant if there exists a reasonable or probable cause that a person has committed a misdemeanor in the officer's presence. Neb. Rev. Stat. § 29-404.02(2)(d) (Reissue 1995). The district court then cited *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998), *cert. denied* 525 U.S. 895, 119 S. Ct. 219, 142 L. Ed. 2d 180, and *State v. Tucker*, 242 Neb. 336, 494 N.W.2d 572 (1993), for the proposition that voluntary flight immediately or soon after the occurrence of a suspected crime may be considered as an inference of guilt. Newton correctly notes in his brief that these cases do not allow an officer to infer guilt from voluntary flight, but, rather, these cases stand for the proposition that to aid in determining the innocence or guilt of a defendant, a jury may consider the defendant's voluntary flight immediately or soon after the occurrence of a crime. However, we agree with the district court's conclusion that the totality of all the circumstances on June 19, 1997, including Dunn's attempt to flee from Huffman, established reasonable or probable cause that Dunn was driving the Firebird while his driver's license was still under suspension, which is a misdemeanor. Neb. Rev. Stat. § 29-404.03 (Reissue 1995) provides in part, with respect to arrests without a warrant:

> In determining whether reasonable cause exists to justify an arrest, a law enforcement officer may take into account all facts and circumstances, including those based upon any expert knowledge or experience which the officer in fact possessed, which a prudent officer would judge relevant to the likelihood that a crime has been committed and that the person to be arrested has committed it.

Accordingly, we affirm the district court's finding that Huffman had probable cause to arrest Dunn on the evening of June 19.

### (c) Fourth Amendment

After determining that Dunn was arrested or seized by Huffman on the evening of June 19, 1997, the district court found that based on a Fourth Amendment objective reasonableness

analysis, Huffman used reasonable force to effect the seizure of Dunn and reasonable force to protect himself from serious injury when assaulted by Dunn. A seizure in the Fourth Amendment context occurs only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. *State v. Anderson*, 258 Neb. 627, 605 N.W.2d 124 (2000). Circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of a citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Id.* Thus, in determining the point at which an arrest or seizure occurs, the court must look at the totality of the circumstances viewed objectively under a "reasonable person" standard while applying the above pertinent factors. See *State v. Horn*, 218 Neb. 524, 357 N.W.2d 437 (1984).

In the present case, Huffman followed Dunn in a marked patrol car with activated overhead lights. When both men exited their respective vehicles, Huffman told Dunn he was under arrest. Huffman's affidavit and deposition testimony also indicates that he again told Dunn he was under arrest at the door to the sugar factory and as Huffman approached Dunn in the hallway near the stairwell. A reasonable person in the same circumstances as Dunn would not have believed he was free to leave. Accordingly, we affirm the district court's finding that Dunn was arrested or seized and further find that Newton's arguments with regard to Dunn's arrest are based on speculation and without merit.

The district court next turned to a Fourth Amendment analysis to determine Huffman's liability, if any, for Dunn's subsequent death during the altercation as Huffman attempted to effectuate his arrest. The district court noted that the Fourth Amendment secures the right of the people from "unreasonable seizures," concluding that to determine if a seizure is constitutional becomes an issue of reasonableness. The U.S. Supreme Court has noted that the " 'reasonableness' " of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L.

Ed. 2d 443 (1989). The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. *Id.* As in other Fourth Amendment contexts, however, the " 'reasonableness' " inquiry in an excessive force case is an objective one: the question is whether the officers' actions are " 'objectively reasonable' " in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. 490 U.S. at 397.

Newton asserts that the district court's analysis is premised on the fact that the only statement Huffman made to Dunn was that he was under arrest and that only after Huffman made this statement, did Dunn flee. Newton further asserts that what really occurred is for the jury to determine once they have heard all of the evidence and not just the version proffered by Huffman. Newton argues that the evidence in this case would establish one of two situations: (1) Dunn opened his door and bolted before Huffman could have said anything or (2) Dunn exited his vehicle and Huffman either said or did something which prompted Dunn to run. Newton speculates that one of the things that could have happened was that Huffman drew his gun immediately and went through the door with his gun drawn and that Dunn fled as his only option. Newton also argues that the scenario inside the factory hallway as described by Huffman makes no sense. Newton further asserts that when the evidence of the mark on Dunn's forearm shown in the autopsy photographs, together with the comparison made by Oliver to the front sight of Huffman's weapon, are presented to the jury, the jury will know that Huffman's gun was drawn when any punch was thrown and that Huffman lied about how the gun came to be drawn, allowing the jury to disregard Huffman's testimony. Again, Newton's arguments are based not on reasonable inferences that can be drawn from the record, but on speculation. Determination of the questions of when the gun was drawn or by whom is not relevant or necessary in light of the district court's finding of reasonable force. We affirm the district court's conclusion that based on an objective reasonableness analysis, Huffman used reasonable force to effect the seizure of Dunn.

### (d) Qualified Immunity

The district court found that Huffman was entitled to qualified immunity as a reasonable officer in Huffman's position could have believed that the use of deadly force was not excessive and that he was justified to believe Dunn posed a threat of serious harm to him. Neither a state nor its officials acting in their official capacities are "persons" under § 1983. *Shearer v. Leuenberger*, 256 Neb. 566, 591 N.W.2d 762 (1999). Under § 1983, public officials sued in their individual capacity are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.* For a constitutional right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. *Id.*

The district court reasoned that in the present case, the right to be free from deadly or excessive force was a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures. See *McGruder v. Heagwood*, 197 F.3d 918 (8th Cir. 1999). The district court further reasoned that the defense of qualified immunity would be valid if a reasonable officer in Huffman's position, with the same information that was available to Huffman, would have believed that the use of deadly force was reasonable and would not violate Dunn's Fourth Amendment right against unreasonable seizure. The use of force under the Fourth Amendment and the availability of the qualified immunity defense each rely on an "objective reasonableness" standard. The use of deadly force is justifiable when the actor believes that such force is necessary to protect himself or herself against death or serious bodily harm unless the actor knows that he or she can avoid the necessity of using such force with complete safety by retreating. *State v. Allison*, 238 Neb. 142, 469 N.W.2d 360 (1991); Neb. Rev. Stat. § 28-1409(4) (Reissue 1995). Deadly force is force which the actor uses with the purpose of causing or which he or she knows to create a substantial risk of causing death or serious bodily harm. *State v. Allison, supra.* A person using force to protect himself or herself may estimate the necessity of such use of force under the circumstances as he or she believes them to be when the force is

used. *State v. Allison, supra*; § 28-1409(5). See, also, *Tennessee v. Garner*, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) (concluding that deadly force may not be used to prevent escape of apparently unarmed suspected felon, unless it is necessary to prevent escape and officer has probable cause to believe that suspect poses significant threat of death or serious physical injury to officer or others); *McGruder v. Heagwood, supra*; *Nelson v. County of Wright*, 162 F.3d 986 (8th Cir. 1998) (Eighth Circuit affirmed summary judgment in favor of defendants and agreed officer's actions were objectively reasonable); *Greiner v. City of Champlin*, 27 F.3d 1346 (8th Cir. 1994) (officers' actions were objectively unreasonable when plaintiff fled in attempt to escape arrest and struggled with police).

In the present case, Huffman knew that Dunn was possibly involved in a recent disturbance and was also aware that Dunn had been violent in the past, having previously resisted arrest. The evidence, taken in the light most favorable to Newton, is that during the course of the arrest, Dunn physically attacked Huffman, striking him about the head with sufficient force to cut his cheek and dislodge his glasses. The district court reasoned that at the time of the attack, Huffman had little or no time to react and found that a reasonable officer would have concluded that deadly force was reasonable under the circumstances to prevent serious physical harm to himself.

Newton asserts that Huffman was never under the apprehension that deadly force would be necessary, as according to his testimony, he went through the factory door with no weapon in hand and never made an affirmative attempt on his own to draw his gun, baton, mace, or flashlight, even after being punched by Dunn. Newton questions why Huffman went through the factory door alone and with nothing in hand to aid him in the event his suspicions were true, that is, if Huffman believed Dunn posed a threat of serious harm to him. Newton's assertions ignore the fact that officers are often forced to make critical judgments about the amount of force that is necessary in a particular situation under rapidly evolving circumstances. *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). We agree with the district court's determination that a reasonable officer in Huffman's position could have believed that the use of

deadly force was not excessive and that Dunn posed a threat of serious harm. Accordingly, we affirm the district court's determination that Huffman is entitled to qualified immunity.

### (e) Eighth Amendment

The district court found that the evidence was devoid of any subjective element, or a sufficiently culpable state of mind to preclude summary judgment on an Eighth Amendment basis. The district court cited *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997), wherein the court stated:

> To prevail on an Eighth Amendment claim, an inmate must show both an objective element, that the deprivation was sufficiently serious, and a subjective element, that the defendant acted with a sufficiently culpable state of mind. . . . In a deprivation of medical care case, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs. . . . In order to succeed, an inmate must show both that he or she had an objectively serious medical need and that the defendant knew of and disregarded that need.

(Citations omitted.) See, also, *Williams v. Kelso*, 201 F.3d 1060 (8th Cir. 2000); *Lutheran Medical Center v. City of Omaha*, 229 Neb. 802, 429 N.W.2d 347 (1988) (confirming that city has (1) constitutional obligation, as part of due process, to provide medical attention to persons in police custody and (2) common-law liability to pay for medical treatment required by person in police custody, such as suspect wounded by police in process of apprehending suspect and such other persons needing necessary medical care while in custody); *Lutheran Medical Center v. City of Omaha*, 204 Neb. 292, 281 N.W.2d 786 (1979) (noting that city of metropolitan class is liable for emergency medical treatment required by criminal suspect in police custody who is wounded by police in process of apprehension and that intentional indifference to medical needs of prisoner is proscribed by Eighth Amendment to U.S. Constitution as being cruel and unusual punishment).

In the present case, Newton challenged in his petition only the medical treatment administered by Huffman to Dunn following the shooting. Huffman testified about his training, the

steps he took once he realized that Dunn was seriously injured, and the reasons for his actions. The district court found that Huffman's evidence, which was devoid of the aforementioned "subjective element," entitled him to judgment as a matter of law on Newton's Eighth Amendment claim. The district court further found that Newton had not presented evidence to the contrary. Newton does not address any arguments to the district court's findings with regard to his Eighth Amendment claim in either his initial or his reply brief. Accordingly, we do not further address this claim.

### (f) Governmental Subdivision's Liability for Failure to Train

Finally, Newton claims that the County is liable for Dunn's death because of its failure to properly train and supervise its deputies. Newton further asserts that the procedures followed by Huffman on June 19, 1997, were fully inadequate as a result of the County's failure to properly train him and to have requisite policies and procedures in effect concerning foot pursuit and the use of backup. The U.S. Supreme Court addressed a municipality's liability under § 1983 for its failure to train municipal employees in *Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989), and concluded that an allegation of a "failure to train" could be the basis for liability under § 1983 in limited circumstances. The Court in *Canton* held in pertinent part as follows:

> We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. . . . Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. . . . "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. . . . Only where a failure to train reflects a "deliberate" or "conscious" choice by a

municipality—a "policy" as defined by our prior cases—can a city be liable for such a failure under § 1983.

... The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

(Citations omitted.) 489 U.S. at 388-90. The Court went on to explain that judicial focus must be on the adequacy of the training program in relation to tasks a particular officer must perform, that it is not sufficient to simply show that an injury could have been avoided with better training or that an adequately trained officer made a mistake and that a governmental subdivision can be held liable for actions of its officers only where the subdivision's "official policy" caused a constitutional violation.

In the present case, liability will attach only if Huffman's application of the County's "policy or custom" violated Dunn's constitutional rights. Evidence on the motion for summary judgment included deposition and affidavit testimony from Sheriff Moore, who testified that all County deputies on road patrol alone were certified and trained by the Nebraska Law Enforcement Training Center. Moore further testified that Huffman had been certified and trained by the training center, and had been trained in the legal requirements for probable cause, the use of force, and emergency medical treatment and CPR. Moore also testified that in his 4 years in office, there had been no claims of improper supervision or training that he was aware of, other than the present case, nor was he aware of any pattern of complaints of improper

training. Finally, Moore testified that all deputies were required to have emergency medical/CPR training.

Newton argues that in the present case, no one, including Huffman's backup, was aware that Huffman had exited his vehicle and was pursuing Dunn on foot and that no call for backup or assistance was made until after Dunn had been shot. Newton notes that the County's vehicle pursuit policy requires the dispatcher to advise the shift commander of the pursuit, at which time the shift commander takes control over the pursuit to ensure compliance with the policy. Newton asserts that nothing in the County's policies or procedures discusses whether backup should be called and be onsite before a foot pursuit is initiated into a building at night. Newton argues that having no specific written policy on the use of backup involving foot pursuits, where, when, and how foot pursuits may be initiated and maintained, and under what circumstances they can continue to exist, places an officer in a situation where he or she is just as likely to make the wrong choice as the right one.

The record shows that while the County had no separate written policy regarding "foot pursuit" or the "use of backup," those concerns were incorporated into the County's use-of-force continuum and training on that policy. The record further shows that decisions as to foot pursuit and backup were part of the arrest tactics and procedures of the County's use-of-force continuum. The district court found that the lack of a separate policy, standing alone, did not meet the threshold requirement of "deliberate indifference," inasmuch as those issues were part and parcel to the County's policies regarding arrest factors and use of force. The district court further found that the evidence was undisputed that the claimed violation of Dunn's civil rights was not caused by foot pursuit, lack of backup, or lack of training, but was proximately caused by Dunn's attack on Huffman. The district court reasoned that if Huffman had not stopped Dunn's vehicle, had not attempted to arrest Dunn, and had not followed Dunn when he fled, Dunn would not have had the opportunity to assault Huffman, which resulted in the shooting. See *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985) (stating that "[o]bviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be

identified behind almost any such harm inflicted by a municipal official; for example [a police officer] would never have killed Tuttle if Oklahoma City did not have a 'policy' of establishing a police force"). However, the district court concluded that the pertinent inquiry in the present case was whether the County had a "use of force" policy, to include the use of deadly force. The County has clearly adopted such a policy. We agree with the district court's finding that the lack of separate and distinct policies regarding "foot pursuit" and "use of backup" cannot be said to be "so obvious" that any failure to separately train on those issues can be properly characterized as a "deliberate indifference" to an arrestee's constitutional rights. Accordingly, we affirm the district court's ruling with regard to Newton's claim of the County's "failure to train."

## 2. APPELLEES' CROSS-APPEAL

On cross-appeal, appellees assert that the district court erred in (1) admitting the testimony of Oliver because he was not an expert and (2) admitting into evidence the affidavits of Oliver. Because we are affirming the district court's decision to grant appellees' motion for summary judgment, we do not further address their cross-appeal. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it. *White v. Board of Regents*, 260 Neb. 26, 614 N.W.2d 330 (2000).

## VI. CONCLUSION

The district court properly granted the motion for summary judgment of appellees for the reasons stated above.

AFFIRMED.